**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

JORGE GOLDEN, *individually and on*
*behalf of all others similarly situated*, and
ANTHONY YBARRA,

      Plaintiffs,

v.                                                                              Civ. No. 22-579 GJF/GBW

QUALITY LIFE SERVICES, LLC,
SALLY CHAVEZ, and APRIL LICON,

      Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

THIS MATTER is before the Court on Plaintiffs' "Opposed Motion to Certify Class" [ECF 27] (Motion). The Motion is fully briefed. *See id.*; ECFs 30 ("Response"), 31 ("Reply"). On April 7, 2023, the Court heard oral argument on the Motion and considered additional evidence. ECF 50 ("Tr."). Having reviewed the entire record and applicable law, and for the reasons explained below, the Court **GRANTS IN PART AND DENIES WITHOUT PREJUDICE IN PART** Plaintiff's Motion.

## I.      BACKGROUND

Defendant Quality Life Services, LLC ("QLS") is a New Mexico limited liability company formed by Defendants Sally Chavez and April Licon. ECF 40 at ¶¶ 6–8 ("Am. Compl."); *see also* ECF 27-1 at 45. QLS specializes in rendering "health care services to [developmentally disabled] patients in their homes or the health[-]care facilities" that house them. Am. Compl. at ¶ 19; *see also* ECF 27-1 at 44; Quality Life Services LLC Home, https://qlsnm.com/ (last visited Apr. 26, 2023). To provide these services, QLS hires "direct

1

service personnel" ("DSPs").  ECF 27-1 at 28.  DSPs "[o]versee and assist" QLS's clients during "meal preparation, personal hygiene, [and] grooming"; chauffeur them; supervise them in "recreational activities both at home and in the community"; monitor them "during evening hours . . . in case of emergency"; informally advocate for their clients' "individual needs and desires"; "[a]ssist with chores, weekly budgets[,] and special requests"; and "[p]erform any other duties assigned by" QLS management.  *Id.* at 28.  Defendants promise these DSP-provided services "24 hours per day, 365 days a year."  ECF 51-1 at Bates No. 000171.[1]  Plaintiffs Jorge Golden and Anthony Ybarra (collectively "Plaintiffs") are former DSPs.  *Id.* at 15, 24.[2]

This case arises from how Defendants paid the DSPs.  As summarized in the Amended Complaint, Plaintiffs claim that Defendants made virtually all DSPs work overtime yet classified them as "independent contractors" instead of "employees" to avoid paying them federally mandated overtime wages.  *E.g.*, Mot. at 1; *accord* 29 U.S.C. § 207 (requiring employers pay employees at least one-and-a-half times their normal wage for any hours worked over 40/week).  On August 3, 2022, Plaintiffs filed this action seeking those unpaid overtime wages, which they allege were withheld in violation both of the Fair Labor Standards Act ("FLSA") and the New Mexico Minimum Wage Act ("NMMWA").  Am. Compl. at ¶¶ 61–62.

Plaintiffs filed the Motion on December 22, 2022.  In it, they seek to convert their individual claims into a collective action on behalf of a proposed class of "[a]ll current and former [DSPs] of [QLS] who worked over forty hours a week from August 3, 2019[,] to present and [who] were not paid overtime wages for overtime hours worked."  Mot. at 1–2.  Plaintiffs

---

[1] This exhibit was submitted to the Court without objection following the motion hearing.  *See infra* n.9.

[2] At oral argument, Plaintiffs' counsel explained that Plaintiff Ybarra's declaration is partly outdated because he stopped working as a DSP for QLS after filing his declaration.  *Compare* ECF 27-1 at 15, *with* ECF 40-1 at 1, *and* Tr. at 10:19–21.

request class certification under Federal Rule of Civil Procedure 23 or, alternatively, conditional certification under FLSA § 216(b) should their Rule 23 request be denied.  *Id.*

## II.   LEGAL STANDARDS

### A.  Rule 23 Class Actions

Rule 23 governs class certification.  *E.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 298–99 (2010).  The Rule allows certification of a class action if the trial court independently finds that Rules 23(a) and 23(b) are both satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  Satisfying Rule 23 requires meeting Rule 23(a)'s four prerequisites and at least one of the three options allowed under Rule 23(b).  *E.g.*, *Soseeah v. Sentry Ins.*, 808 F.3d 800, 808 (10th Cir. 2015); *accord Dukes*, 564 U.S. at 351.

First, Rule 23(a) requires the party seeking certification to show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

*Dukes*, 564 U.S. at 345; *accord* Fed. R. Civ. P. 23(a).[3]  Second, the party seeking certification "must also satisfy [with] evidentiary proof at least one of the provisions of Rule 23(b)."  *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Dukes*, 564 U.S. at 350).  Here, the provision at issue is Rule 23(b)(3), which requires

---

[3] In class action vernacular, these requirements are known as "numerosity," "commonality," "typicality," and "adequacy."  *See Dukes*, 564 U.S. at 350.

showing that:

> [1] the questions of law or fact common to class members predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).[4]

These requirements "are heavily scrutinized and strictly enforced." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014). The party seeking certification bears the burden of "affirmatively demonstrat[ing] . . . compliance with the Rule"—namely, showing "that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350 (emphasis in original); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (requiring the same of Rule 23(b)). The burden demands no less than the traditional measure of persuasion in civil cases—a preponderance of the evidence. *E.g.*, *Abraham v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 259 n.67 (D.N.M. Aug. 16, 2016).

Rule 23 is no "mere pleading standard, so the Court cannot "blindly rely" on the representations of either party. *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004) (internal citation and quotation omitted). Rather, the Court must undertake a "rigorous analysis" to convince itself that Rule 23 is fully satisfied. *Dukes*, 564 U.S. at 350.[5] The trial court can consider the claims' merits at the certification stage only insofar as those substantive issues overlap with Rule 23's procedural requirements. *See, e.g.*, *Dukes*, 564 U.S. at 351 (district court's analysis will often "entail some overlap with the merits of the plaintiff's underlying claim"); *but see Amgen v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule

---

[4] Plaintiffs do not request certification under Rule 23(b)'s other provisions, so the Court does not discuss them. *See, e.g.*, *Dukes*, 564 U.S. at 346 n.2.

[5] The Court's analysis of a party's factual showing "will frequently entail overlap with the merits of the plaintiff's underlying claim." *Behrend*, 569 U.S. at 33–34 (internal quotation omitted). But the court's limited license to look towards the merits is coterminous with relevancy for Rule 23 purposes. *Dukes*, 564 U.S. at 351; *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. . . . Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

The end result of the trial court's rigorous analysis is reviewed only for abuse of discretion. Reversal occurs only if the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] . . . an improper application of law to fact[,]" or "hold[ing] a plaintiff seeking class certification to a higher standard of proof than proof by a preponderance of the evidence." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *accord DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

### B. FLSA Collective Actions

Congress enacted the FLSA in 1938 to eliminate substandard working conditions caused by "the unequal bargaining power as between employer and employee." *See generally Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). Subject to certain exclusions, Section 7 of the FLSA generally requires that employers pay their employees at least one-and-a-half-times their hourly wage for any hour worked beyond 40 per week. 29 U.S.C. § 207. To encourage employees to vindicate their FLSA rights, Section 16 authorizes collective actions on behalf of a named plaintiff's "similarly situated" coworkers. 29 U.S.C. § 216(b).[6]

---

[6] The FLSA provides in relevant part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages . . . . An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself

FLSA actions permit collective treatment not through Rule 23 but, rather, a two-step certification process.  *See Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001) (endorsing this so-called "ad hoc" approach).  At the first stage—the "notice stage"—the court must decide whether the putative class is "similarly situated" enough to warrant provisional class treatment for the purposes of disseminating notice to all similarly situated potential plaintiffs.  *Id.*; *see also Landry v. Swire Oilfield Servs., LLC*, 252 F. Supp. 3d 1079, 1091–92 (D.N.M. May 2, 2017).  Stage two—the "decertification stage"—is not yet at issue in this case. *See generally Thiessen*, 267 F.3d at 1102–03 (explaining the difference).

The notice stage standard is "fairly lenient."   *Compare id.* at 1103, *with Eagle v. Freeport-McMoran, Inc.*, No. 15-CV-00577, 2016 WL 7494278, at *2 (D.N.M. Aug. 3, 2016) (unreported) (citation omitted) (conditionally certifying at the notice stage is "by no means automatic").  To succeed, a plaintiff must produce "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102 (internal citations and quotations omitted); *e.g.*, *Deakin v. Magellan Health, Inc.*, 328 F.R.D. 427, 432 (D.N.M. Oct. 5, 2018).  These allegations must "describe the potential class within reasonable limits and provide some factual basis from which the court can determine if similarly situated potential plaintiffs exist." *Landry*, 252 F. Supp. 3d at 1114 (internal citations and quotations omitted); *Freeport-McMoran*, 2016 WL 7494278, at *2 (citation omitted) ("At least some evidence beyond unsupported factual assertions must be presented.").  The court weighs the plaintiff's showing by looking to considerations such as "whether the potential class members: (i) have the same employer; (ii) are subject to the same employer practices; (iii) suffer

---

or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

the same method of calculation of wages owed; and (iv) allege FLSA violations based on the same conduct." *Pruess v. Presbyterian Health Plan, Inc.*, No. 19-CV-629, 2020 WL 6544243, at *3 (D.N.M. Nov. 6, 2020) (internal citation omitted).  Unlike Rule 23, a court considering these allegations is forbidden from "weigh[ing] the evidence, resolv[ing] factual disputes, or rul[ing] on the merits of the plaintiffs' claims." *Landry*, 252 F. Supp. 3d. at 1116.

Once presented with sufficient allegations of commonality, the trial court then sets a notice period.  29 U.S.C. § 255(a).  The statute of limitations depends on the alleged FLSA violation: by default, the limitations period is the preceding two years unless the complaint accuses the employer of a willful violation, in which case the statute allows a three-year period. *Id.*

## III.   PARTY ARGUMENTS

Plaintiffs seek to proceed on behalf of themselves and "[a]ll current and former [DSPs] of [QLS] who worked over forty hours a week from August 3, 2019[,] to present and were not paid overtime wages for overtime hours worked."  Mot. at 1–2.  They prefer to proceed under Rule 23 and, only in the alternative, under FLSA § 216(b).  Plaintiffs argue that the evidence they have included satisfies all six Rule 23 prerequisites at issue here—numerosity, commonality, typicality, adequacy of representation, predominance, and superiority.  Mot. at 5–13.  Reduced to its essence, Plaintiffs' overall assertion is that Defendants categorically and systematically mislabeled all DSPs as independent contractors despite "treat[ing] DSPs as employees in every way."  Mot. at 1 (alleging that Defendants controlled DSPs' shift assignments and working conditions as an employer would and applied the same flawed wage calculus to all DSPs).  For

7

FLSA § 216(b), Plaintiffs assert that their Rule 23 arguments and evidence would also satisfy the "similarly situated" standard required for conditional certification.

To carry their burden, Plaintiffs provided declarations and other documentary evidence.[7] The declarations came from: (1) three former DSPs, Plaintiffs Golden and Ybarra along with Natasha Marta, ECF 27-1 at 16–26, 30–32; (2) one current DSP, Juan Esparza, *id.* at 20–22; and (3) one former DSP-turned-manager, Jennifer Padilla, *id.* at 9–13.   Plaintiffs' documentary evidence consisted of a DSP "job description" of unknown origin, *id.* at 28; a "[QLS Employee] Handbook" detailing policies applicable to all DSPs, *id.* at 28[8]; QLS public records, *id.* at 44–46; and a two-week timesheet exemplar from Plaintiff Golden, *id.* at 48.   Lastly, Plaintiffs included declarations from both of their attorneys.  *Id.* at 56–60.

Defendants contest certification under both statutes.  First, Defendants challenge five of Plaintiffs' six Rule 23 factors and, in doing so, stress that Defendants bear no burden of proof. Resp. at 2–7.[9]   To buttress their position, Defendants offer the declaration of Defendant Licon, screenshot excerpts of alleged conversations between her and Plaintiff Golden, and Plaintiffs' response to a written discovery request.  ECF 30-1.  Regarding conditional certification under FLSA §216(b), Defendants refer the Court to their Rule 23 arguments which, in their view, also show that Plaintiffs have failed to satisfy the "similarly situated" standard.  Resp. at 8–9.

---

[7] Neither party accepted the Court's invitation to call witnesses.  ECF 46.

[8] The Motion attached only an excerpt from the handbook, but Plaintiffs later provided the full handbook to the Court.  *See* ECF 46 (allowing the submission of additional evidence).  The unabridged handbook is attached to this order and referenced as "ECF 51-1."

[9] Defendants have conceded that the named plaintiffs adequately represent the putative class.  *See* Resp. at 3–6.

## IV.   ANALYSIS

For the reasons explained below, Plaintiffs have not yet offered sufficiently convincing evidence to satisfy all six Rule 23 prerequisites.   But because they have provided more than enough to satisfy the lighter burden of FLSA § 216(b) certification, the Court will conditionally certify the FLSA collective and deny without prejudice the request for Rule 23 certification.   The Court will also establish a deadline by which Plaintiffs may file a renewed motion for Rule 23 certification.

### A.  At this Stage, Plaintiffs Have Not Met Their Burden Under Rule 23(a)

#### 1.  Numerosity

##### a.  Legal Standard

Numerosity requires that "the class [be] so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   The touchstone of impracticability is "the Court's ability to handle the case as a non-class action" had the claims been individually pursued. *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).   Numerosity is not "a question of numbers." *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) (internal citation omitted).   For that reason, the Tenth Circuit prescribes no "set formula" to calculate the number of class members sufficient for Rule 23's numerosity requirement. *E.g.*, *id.* (citing *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978)).   Instead, the Tenth Circuit directs trial courts to consider such factors as "the nature of the action, the size of the individual claims, and the location of the members of the class or the property" at issue. *Id.*  Because the inquiry is so "fact-specific," it is therefore "left to the district court's discretion." *E.g.*, *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 658 (D.N.M.

9

Sept. 16, 2019) (internal citation omitted) (collecting cases where classes of as few as 40 members would be impracticable to join).  Further, when the action involves an employment law claim, district courts typically certify smaller Rule 23 classes due to the unique risk of employer retaliation.  *E.g.*, *Felps v. Mewbourne Oil Co., Inc.*, 336 F.R.D. 664, 670 (D.N.M. Nov. 16, 2020) ("In employment actions like this one, a class member's potential fear of retaliation is an important consideration in deciding whether joinder is impracticable.").

### b.   Parties' Numerosity Arguments

Plaintiffs urge the Court to find numerosity here based on their evidence alleging that, at any given time, QLS employed "over 100 DSPs," approximately 80 of whom worked overtime. Mot. at 7–8 (citing four declarants' estimates); Reply at 4 n.1 (citing *In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1221–22 (D.N.M. 2012)) (invoking the "presumption that joinder is impracticable" when facing a proposed class of at least 40).  Defendants' response is twofold: (1) the class size must be, at a minimum, 100 members and (2) the Motion fails to discuss impracticability.  Resp. at 3–4.  Defendants also downplay the putative class's size, entirely relying on Defendant Licon's declaration that only "30-35% of the DSPs worked more than 30 hours per week."  *Id.* at 4 & n.2; *but see* Tr. at 25:4–5 (admitting at oral argument that putative class may include as many as 461 DSPs and that 30–35% of that number amounts to approximately 138 DSPs.).

### c.   Numerosity Findings

The parties agree that the putative class involves some number of individuals greater than 100.  Mot. at 7–8; Tr. at 25:4–5.  If the actual number is anywhere between 100 and 461, such a class would be presumptively impracticable to join.  *Cf.* Joseph M. Feller, *The Adjudication that Ate Arizona Water Law*, 49 Ariz. L. Rev. 405 (2007) (demonstrating the extreme complications

of using joinder for more than 100 parties).  In addition, this case is a wage claim, and the issue of employer retaliation has already been raised.  *See* ECF 34.[10]

Although numerosity is not purely "a question of numbers," and the parties' debate about class size overlooks the more central point of impracticability, the legal principles and evidence that Plaintiffs have provided convince the Court that joinder would be impracticable enough to justify finding numerosity here.  *Abercrombie*, 765 F.3d at 1215 (internal citation omitted).

### 2. Commonality

#### a. Legal Standard

Commonality demands proof of some "question[ ] of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Such a question—or, precisely, its answer[11]—must demonstrate the litigation's "capacity . . . to generate common *answers* apt to drive the resolution of the litigation."  *E.g.*, *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (emphasis in original) (citing *Dukes*, 564 U.S. at 350).  These common issues must be "capable of class[-]wide resolution" and "central to the validity of each . . . claim[ ]."  *Id.*  Thus,

---

[10] After the Motion was fully briefed, Plaintiffs filed a subsequent motion alleging that Defendants stripped declarant Esparza of his lucrative day shift and pressured him into signing a document agreeing "not to participate in the lawsuit" and that " [he is] a subcontractor and not an employee."  ECF 34 at 5 (detailing how Defendant Licon, just before presenting Esparza with this alleged document, specifically referenced this lawsuit and her "team of attorneys").  Plaintiffs further allege that Licon offered to put Esparza back on the schedule if he signed the document, but she refused to let the offer remain valid should he leave without signing or consult his sister first—both of which he requested to do.  *Id.* at 13.  Defendants deny any wrongdoing and, pursuant to an agreement between both sides, Plaintiffs voluntarily withdrew the motion that raised this issue.  Tr. at 38:7–20.

[11] To be clear, the text of Rule 23(a)(2) calls for common legal or factual *questions*—either "disputed [factual] issue[s] to be resolved . . . [at] trial" or "[disputed legal] issue[s] to be decided by the judge"—not *answers*.  *Dukes*, 564 U.S. at 369 (Ginsburg, J., dissenting) ("[A] 'question' 'common to the class' must be a dispute, either of fact or of law, the resolution of which will advance the determination of the class members' claims.").  But, as a five-justice majority explained, a common "question" does not necessarily produce an answer that justifies the continued use of a collective action.  *Id.* at 349–52; *but see id.* at 374–77 (criticizing the majority's construction for importing Rule 23(b)(3)'s predominance requirement into the other two 23(b) classes).  So, since *Dukes*, the inquiry now focuses on whether the class members "have suffered the same injury" rather than whether an open question of such class-wide harm may have occurred.  *Dukes*, 564 U.S. at 351 (internal citation and quotation omitted).

a successful plaintiff must "identify some unifying thread among the members' claims that warrants class treatment"—not issues "identical as to each member." *Felps*, 336 F.R.D. at 670.

In cases involving employment policies, the unifying thread can be found by examining "whether the challenged policy is common to the class as a whole, and whether the proposed class members share similar job duties." Misclassification cases involving a policy categorically applied to the entire class typically present a common question because "the central question of whether employees were wrongfully classified as exempt from overtime pay requirements" unites them. *Id.* at 671 (internal quotation and citation omitted); *e.g.*, *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). Thus, provided that a plaintiff can prove by a preponderance that the policy exists, Rule 23(a)(2) is satisfied. *E.g.*, *Flores v. Anjost Corp.*, 284 F.R.D. 112, 125 (S.D.N.Y. 2012); *see also Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 159 (S.D.N.Y. May 27, 2008); *cf. Gandy v. RWLS, LLC*, CV No. 17-558, 2019 WL 1407214 (D.N.M. Mar. 28, 2019) (unreported) (finding the lack thereof dispositive and denying certification because, unlike here, individualized inquiry was needed to assess the applicability of an NMMWA exception).

### b. *Parties' Commonality Arguments*

Plaintiffs argue that this case presents a sufficiently "common" legal question because all putative class members' claims require determining whether Defendants improperly classified them as independent contractors. Mot. at 8–9. Plaintiffs point to the similarities of DSPs' job duties and QLS's class-wide DSP policy to withhold overtime premiums for overtime hours because, in Defendants' view, DSPs were actually independent contractors and therefore ineligible. Mot. at 9; Reply at 4. These two allegations, they argue, unite all class members.

Mot. at 8; Tr. at 8:22–10:1 (noting that their evidence relies on declarant Padilla because Defendants' discovery responses avoided substantively addressing this question).

Defendants argue in opposition that the job duties of the DSPs can vary enough to justify individualized inquiries.  *E.g.*, Resp. at 2 ("DSPs are given the freedom to perform their caregiving responsibilities as they see fit, and DSPs differ in how they perform their job[s]."); *see also id.* at 4–5.  Defendants further allege that (1) DSPs have input regarding their schedules and client assignments; (2) DSP hours vary; and (3) DSPs have the chance to moonlight elsewhere and do.  *Id.* at 1–2.  In reaction to the "uniform payment methodology" that Plaintiffs allege "applie[s] to the entire class" here, Defendants stress that DSPs' hourly wage rates can vary—albeit never anything close to overtime rates—and that some unspecified number of DSPs allegedly do not work any overtime.  *Id.* at 1, 4.  These arguments rely heavily on Defendant Licon's declaration and one Tenth Circuit mineral leasing case.  ECF 30-1.[12]

### c. *Commonality Findings*

The Court begins with job similarity.  Comparing the foundation[13] underlying each party's evidentiary submissions proves telling.  Plaintiffs' evidence comes from the declarations of five DSPs; Defendants' rebuttal evidence, by contrast, comes from Defendant Licon, whose sole foundation is her "competen[cy] to testify to the matters contained herein."  *Compare* ECF 27-1 at 9–10, 15, 20, 24, 30, *with* ECF 30-1 at 1.  Plaintiffs' declarants have performed DSP

---

[12] Defendants' legal argument is not featured in the analysis because it is wholly distinguishable.  In that case, although there was a uniform pay policy like Defendants' DSP overtime policy here, that issue was dwarfed by the need for individualized inquiries where, unlike here, the proposed class members' financial harm came not from substantially identical terms of employment but, rather, mineral lease terms that varied widely.  *See XTO Energy*, 725 F.3d at 1218 (The mineral leases had "known variations in lease language.").

[13] For clarity, the Court uses "foundation" as it is used in Black's Law Dictionary.  Foundation, *Black's Law Dictionary* (8th ed. 2004) ("The basis on which something is supported").

work themselves and describe it in detail—all DSPs attend mandatory trainings, log their work hours through the "Time Clock Wizard" app, check Time Clock Wizard for shift assignments and client assignments unilaterally set by Defendant Licon, receive supervision from Defendants and QLS house managers, document their work and check in with various managers and supervisors, and are subject to the same disciplinary procedures.  ECF 27-1 at 9–10, 15, 20, 24, 30.  These allegations appear consistent with objective evidence—the declarants' allegations are similar to portions of the QLS Handbook that Defendants wrote themselves.  ECF 27-1 at 9–10, 15, 20, 24, 30; *see generally* ECF 51-1 (explaining in detail how DSPs shall attend to their various responsibilities).

Defendant Licon's declaration, on the other hand, is so noticeably devoid of foundation that her allegations amount to a perfunctory rebuttal at best.  Notwithstanding her access to QLS records that would ostensibly support her, she provides no more than conclusory allegations. Despite the detailed policies and procedures outlined in the QLS handbook—which she neither acknowledges nor explains—Defendant Licon insists that DSPs "can perform the job as they see fit."  ECF 30-1 at 1.  But the QLS handbook "sets forth the duties and responsibilities" of DSPs "in a single job description document . . . and has a single set of "p[olicies]" applicable to all DSPs.  *See Damassia*, 250 F.R.D. at 159.  These policies standardize the DSP job duties, and as a result, control for all variables that would otherwise pose the potential for individualized inquiries capable of undermining commonality.  The logic of other courts applies with equal force here—an internal policy handbook of specific instructions on how employees perform their duties should satisfy the commonality prerequisite because the class-wide policy inherently affects all class members.  *Campbell v. PricewaterhouseCoopers, LLC*, 287 F.R.D. 615 (E.D. Cal. 2012).  Although Defendant Licon need not have provided any declaration at all, since

14

Defendants bear no burden here, the lack of foundation in her declaration diminishes the weight the Court could otherwise assign to it.

Along with performing similar work, Plaintiffs' declarants describe a class-wide employment policy that they claim directly affects their pay as a group. ECF 27-1 at 10, 16, 21, 25, 31 (alleging that they, as DSPs, routinely worked over than 40 hours per workweek); *id.* at 9–10, 15, 21, 25, 32 (alleging that Defendants never paid them or any DSPs more than straight time). The Court accepts these allegations insofar as they seek to prove that the declarants themselves never earned overtime despite working overtime. *Compare id.* at 13, 17, 21–22, 25–26 (alleging that, like the declarants, all other DSPs are paid straight-time-for-overtime without providing much detail on how they know this). Beyond that narrow point, however, the allegations lack much persuasive force because, as explained later, they lack sufficient foundation to extrapolate their experience to other DSPs. But Defendants quell the Court's concern by effectively acknowledging that QLS has a policy of not paying overtime to ***any*** DSPs because QLS considers "all" DSPs to be independent contractors. *See* ECF 41 at 4 ("[A]ll of the caregivers were independent contractors and were not entitled to overtime compensation." (emphasis added)). Thus, the combination of Plaintiffs' evidence and Defendants' acknowledgement provides a sufficient factual basis to conclude that a company-wide policy for DSPs likely existed. That conclusion, in turn, makes the legal question—whether such a policy was lawful—applicable to each of the putative class members' claims.

Defendants' arguments do not convince the Court otherwise. For purposes of commonality, all that matters here is that, under QLS policy, none of the DSPs working overtime were paid time-and-a-half for any of that overtime. Reply at 5; *accord Felps*, 336 F.R.D. at 672

(resting commonality "on the contention that the policy and practice of [mis]classif[ication] – [*sic*] together with the standard practice of assigning [overtime] – [*sic*] 'had the effect of causing the class to perform uncompensated work.'").  Like employers in other cases where commonality was proven, Defendants admit that they "do[ ] not consider any factors other than job title in deciding to categorize [DSPs] as exempt." *Damassia*, 250 F.R.D. at 159.  Defendants' focus on the range of DSPs' hourly wages does not change the fact that plugging in different values for the variable does not change the structure of the equation.  Further, whether DSPs moonlighted at other caregiving agencies is not especially relevant.  After all, modern society is increasingly replete with employees of one workplace having second jobs with another.

The combination of Plaintiffs' declarations, the QLS handbook, and Defendants' implicit acknowledgment of a uniform pay policy convinces the Court that classification is a "question[ ] of law . . . common to the class" that, once answered, would "resolve an issue that is central to the validity of each [claim] in one stroke." *Dukes*, 564 U.S. at 350.  Further, Plaintiffs' evidence strongly suggests that no serious risk of individualized inquiries exist regarding supposed differences in job duties.  The commonality requirement is satisfied.

### 3.  Typicality

#### a.  Legal Standard

Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Although the claims need not be identical, the class representatives must generally "possess the same interest and suffer the same injury" as the unnamed class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  As other courts have explained, typicality requires "enough congruence between the named representative[s'] claim[s] and that of the unnamed members . . . to justify allowing the

named party to litigate" on the group's behalf.  *Orr v.* Shicker, 953 F.3d 490, 500 (7th Cir. 2020) (internal quotation omitted); *see also Eagle v. Vee Pak, Inc.*, --- F.R.D. ---, 2023 WL 2198470, at *17 (N.D. Ill. Feb. 23, 2023) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)) ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." (internal citation and quotation omitted)).

In practice, this inquiry tends to merge with the commonality analysis because both focus on "whether the named plaintiff[s'] claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Falcon*, 457 U.S. at 157 n.13. Typicality allows for some factual difference among the putative class members "so long as the claims of the class representative and putative class members are based on the same legal or remedial theory."  *Bd. of Educ. of Albuquerque Pub. Schools v. Brainard*, 339 F.R.D. 650, 656 (D.N.M. June 7, 2021).   But a plaintiff must prove that such extrapolation is justified by "demonstrat[ing] that [the named plaintiff's harm] persist[s] across the putative class." *Hernandez v. Grisham*, 494 F. Supp. 3d 1044, 1139 (D.N.M. Oct. 14, 2020).

### b.  *Parties' Typicality Arguments*

Plaintiffs' typicality argument proceeds straightforwardly enough: (1) Plaintiffs are DSPs who worked overtime but received only straight time pay, (2) all other DSPs have the same unpaid overtime wage claim, and (3) all class members would pursue their unpaid wage claims under the NMMWA.  Mot. at 9; *see also* Reply at 8 ("[Defendants' arguments] do[ ] not alter the fact that *all* DSPs were together the victim of one common plan: to treat them as independent contractors and deny them overtime premiums." (emphasis in original)).   Defendants'

counterargument is even more succinct: (1) Plaintiffs have not proven that Plaintiffs Golden and Ybarra's experiences are typical of all QLS DSPs and (2) the burden does not require that Defendants disprove typicality, but that Plaintiffs prove it.  Resp. at 5–6.

### c.  Typicality Findings

By a preponderance of the evidence, Plaintiffs must prove facts that "bridge the gap" between the named plaintiffs' claims and "the existence of a class of persons who have suffered the same injury."  *Falcon*, 457 U.S. at 148.  To bridge that gap here, Plaintiffs would have to generally prove (1) that the same course of conduct gives rise to the claims of other class members and (2) that all class members base these claims on the same legal theory.  *See Vee Pak*, 2023 WL 2198470, at *17–18.  Given the facts here, Plaintiffs must show that the putative class members are DSPs who (1) worked overtime and (2) did not receive overtime pay and that all members will trace this shared harm to the same class-wide policy.  The Court's numerosity discussion already established that QLS employed hundreds of other DSPs and, as detailed in the commonality assessment, Plaintiffs have already convinced the Court that a uniform policy likely existed.  The question that remains is whether Plaintiffs have satisfactorily shown that other DSPs worked overtime without receiving overtime pay.

Here, all of Plaintiffs' declarations include allegations to the effect that the declarant somehow knows that other DSPs worked overtime but only received straight-time pay for those overtime hours.  But how the declarants claim to know this information causes the Court concern.  The declarants omit any specific details regarding when, where, and with whom they interacted.[14]  The allegations that could be construed as foundation are themselves conclusory

---

[14] Plaintiff Ybarra alleged that, based on "[his] discussions with other [QLS] employees," other DSPs "received straight time for all hours worked, including [overtime]."  ECF 27-1 at 17 (neglecting to specify where, when, and with whom these conversations occurred).  Declarant Esparza provided somewhat more foundation: "[he] talked

allegations.   And Plaintiffs provide no other evidence about these putative class members'
workweeks.    It is well to remember that the Court cannot "blindly rely" on Plaintiffs'
representations in lieu of conducting its own independent and rigorous analysis that Rule 23(a) is
satisfied by a preponderance.  *Shook*, 386 F.3d at 968; *Dukes*, 564 U.S. at 350.   Unlike FLSA §
216, which forbids the Court from resolving factual conflicts, Rule 23 requires factual findings—
at least to the extent needed to analyze Rule 23's prerequisites.  *Compare Amgen*, 568 U.S. at
466, *and Damassia*, 250 F.R.D. 152, 159, *with Landry*, 252 F. Supp. 3d. at 1116.   The evidence
presently before the Court does not permit the Court to impute the declarants' alleged
experiences to the rest of the putative class.  *See, e.g.*, Memorandum Opinion and Order, *Silva v.
Agave Transp. Servs., Inc.*, Civ. No. 21-1117 (D.N.M. Feb. 18, 2023) (using similar reasoning
for even thinner evidence to deny without prejudice a motion to conditionally certify under 29
U.S.C. § 216(b)).

        In sum, Plaintiffs' evidence regarding unidentified putative class members' overtime
shifts and pay does not permit the Court to conclude that the putative members' claims are
similar enough to be "typical" relative to the claims of the named Plaintiffs.  Despite Plaintiffs
alleging a course of conduct that would theoretically affect all class members and permit them to

---

with and worked with other DSPs. . . . [N]one of the[m] ha[ve] ever been paid overtime and that all DSPs are paid as
"contractors" just like [he is]." *Id.* at 21.  He believes, based on this knowledge, that "[s]ome DSPs work upwards
of 300 hours [per] every two weeks." *Id.* at 21–22.  Plaintiff Golden asserted that, because he "worked alongside
other DSP[s] in the same house," and they also used Time Clock Wizard like him, "[he] ha[s] seen pay stubs for
other employees and they look like" his. *Id.* at 25.  Declarant Marta "regularly talked with other DSPs" and
"worked in the same house with some of the other DSPs," which led her to believe that "other DSPs were not being
paid overtime." *Id.* at 32 ("I would ask them what they were making and they would tell me.").  Declarant Padilla,
who interacted with DSPs more than all other declarants, "believe[d] around 75-80% of DSP staff were working
overtime." *Id.* at 13.  Arguably, Declarants Padilla and Marta's allegations are somewhat supported by adequate
foundation, but that still only amounts to two out of 461 potential declarants.  It is enough to say that these
allegations fall short of a preponderance of the evidence.  Whether additional discovery will yield additional
evidence necessary to shore up the typicality inquiry remains to be seen.

pursue claims under the same legal theory, the Court finds Plaintiffs' evidence of typicality to be insufficient at this point.

### 4. Adequacy of Representation

Adequacy of representation requires that the named plaintiff(s) show its "representative parties will fairly and adequately protect the interest of the class."  Fed. R. Civ. P. 23(a)(4). Courts construe this prerequisite to demand adequacy of both named plaintiffs and their attorneys.  *E.g.*, *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 n.5 (1996) (characterizing the requirement as a due process requirement).  To be considered "adequate," named plaintiffs must be free of conflicts of interest and demonstrate the capacity to "prosecute the action vigorously" on behalf of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).  "Adequate" counsel must be qualified and competent.  *Falcon*, 457 U.S. at 157.

Here, Plaintiffs have provided declarations from their attorneys that demonstrate considerable class action litigation experience.  ECF 27-1 at 55–60 (detailing why Messrs. Welmaker and Benoit are qualified, experienced, and capable for class action litigation).  And the Court sees no potential conflict of interest that would cause it concern over the named Plaintiffs serving in a representative capacity or their attorneys' representation of the class's interests.  Further, Defendants concede the adequacy of class counsel as well as Plaintiffs Ybarra and Golden's standing to represent the putative class.  *See generally* Resp. (challenging all but Rule 23(a)(4)).  Thus, the Court finds the adequacy requirement under Rule 23(a)(4) to be satisfied.

**B.  Plaintiffs Have Met their Burden Under Rule 23(b)**

To proceed collectively under Rule 23(b)(3), a plaintiff must show "that the questions of law or fact common to class members [1] predominate over any [individual questions], and [2] that a class action is superior to other available m[eans of] adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

1. Predominance

*a.  Legal Standard*

The purpose of Rule 23(b)(3) is to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness."  Fed. R. Civ. P. 23, Advisory Committee Notes, 1966 Amendments.  To animate this purpose, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Performing this test requires understanding the relationship between the common and individual questions presented in the case.  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  An "individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id.*

The predominance inquiry begins "with the elements of the underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  After establishing all elements of a claim and segregating the individual and common issues, the court then "asks whether the common, aggregation-enabling[ ] issues in the case are more [salient] than the non-

common, aggregation-defeating, individual issues." *Bouaphakeo*, 577 U.S. at 453 (internal citations and quotations omitted). Answering this question requires examining how much individualized proof or legal arguments a plaintiff would need to establish the majority of those elements. *E.g.*, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *partly abrogated on other grounds*, *Dickens v. GC Servs., Ltd. P'ship*, 706 F. App'x 529 (11th Cir. 2017). Where individualized damages determinations are concerned, the case law is settled—the need to calculate each class member's damages does not defeat predominance. *E.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922–23 (10th Cir. 2018).

Here, the predominance inquiry depends on the elements of the NMMWA claim. The NMMWA defines an employee using the "economic reality" test. *E.g.*, *Casias v. Distrib. Mgmt. Corp., Inc.*, Civ. No. 11-00874, 2014 WL 12710236, at *10 (D.N.M. Mar. 31, 2014) (unreported); *accord Garcia v. Am. Furniture Co.*, 689 P.2d 934, 938 (N.M. 1984) (listing factors including "pay, contract, control[,] and voluntary action" that comprise the "total employment situation which disclose[s] the economic reality"). "The focal point" under this test is "whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself." *Casias*, 2014 WL 12710236, at *10 (citing *Doty v. Elias*, 733 F.2d 720, 722–23 (10th Cir. 1984)). Factors relevant to these elements include (1) the degree of control the employer exerts over its worker, (2) the worker's opportunity for profit or loss, (3) the worker's investment in the business, (4) the permanence of the working relationship, (5) the degree of skill required, and (6) the extent to which the work is an integral part of the employer's business.

### b. Parties' Predominance Arguments

Much like their commonality argument, Plaintiffs submit that the common question of misclassification predominates over other issues because Defendants' "employment policy is to misclassify all DSPs to avoid paying overtime," and the policy applies to all DSPs. Mot. at 11. Plaintiffs further argue that the risk of individualized questions is illusory because, as they have shown, "all [DSPs] had the same job duties and were all paid in the same manner." *Id.* at 11. In response, Defendants contend that Plaintiffs have failed to prove sufficient commonality and contends that, by extension, they also fail to prove predominance.

### c. Predominance Findings

As already discussed, the QLS handbook provides policies that dictate how DSPs are expected to perform their jobs. *See generally* Ex. 51-1. Each of the DSP declarants' allegations are consistent with the handbook's policies, which further corroborates their allegations on how a DSP is expected to work. *Compare, e.g.*, *id.* at Bates No. 000212 (forbidding specific circumstances like leaving car keys in the vehicle unattended or allowing doors to be unlocked while driving), *with* ECF 27-1 at 9–10, 15, 20, 24, 30 (alleging similarly high levels of control in DSP mandatory reporting duties, check-ins, and scheduling discretion). Based on these factual showings, the question of job similarity is a common question because it is "susceptible to generalized, class-wide proof." *Bouaphakeo*, 577 U.S. at 453; *but cf.* Resp. at 2 (responding to this evidence with a lone and conclusory allegation). Further, not only did all DSPs perform substantially similar work for QLS, all DSPs were apparently "paid under the same policy." *Bouaphakeo*, 577 U.S. at 459. The policy's applicability is susceptible to class-wide, generalized

proof notwithstanding Plaintiffs' inability to produce evidence showing exactly how many DSPs the policy likely harmed.

The two salient NMMWA issues here, job similarity and pay policy, both lend themselves to class-wide, generalized proof.  The Court finds that Plaintiffs have made a sufficient showing of predominance.

### 2. Superiority

Rule 23(b) provides four factors for courts to consider in determining whether collective treatment is the superior means of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Rule 23(b)(3)(A)–(D).

### a. Parties' Superiority Arguments

Plaintiffs' superiority arguments address all four Rule 23(b)(3) factors.  They contend that the class members' interest in controlling their claims is minimal because these are low-wage workers that have never attempted to sue before and likely would not but for the class action mechanism.  Mot. at 12; *accord* ECF 27-1 at 49–50 (showing no lawsuits naming Defendant QLS on PACER).  They further assert that, because QLS operates solely in Doña Ana County, concentrating the litigation in this forum is particularly desirable.  Mot. at 12.  Last, they submit that the class will not be particularly unmanageable because the members are easily identifiable, relatively small, and limited to a "discrete geographical location."  *Id.* (internal citations and quotations omitted).  Defendants' counterargument addresses only one factor, the

class members' motivation to sue separately.  Their rationale: "[t]here is no reason to assume" a lack of motivation.

### b.  Superiority Findings

As Plaintiffs point out, the putative class members are low-wage employees, none of whom have ever attempted to sue before.  Mot. at 12; ECF 27-1 at 49–50.  The likelihood that the members could be motivated to individually control their claims is thus demonstrably low at best, and no evidence before the Court suggests that any DSPs have a lawyer they trust (besides, of course, the named Plaintiffs).  The evidence further shows that all putative members at least recently resided and worked in the vicinity, and no facts before the Court suggest class member idiosyncrasies troublesome enough to cast doubt on the manageability of this case as a class action.  Thus, the Court finds the Rule 23(b)(3) factors favor collective treatment.

For the foregoing reasons, the Court finds and concludes that Plaintiffs have failed to make a sufficient showing of typicality under Rule 23(a)(3).  The Court therefore denies Rule 23 certification at this relatively early stage without prejudice and will establish a deadline of August 18, 2023, to conduct whatever certification discovery is necessary to file a renewed motion.  In the meantime, the Court will conditionally certify Plaintiffs' requested collective action under the FLSA.

### C.  Plaintiffs Have Met their Burden Under FLSA § 216(b)

#### 1.  Legal Standard

As summarized earlier, FLSA Section 16 authorizes a plaintiff to convert his individual action into a collective action provided he can show that he and his colleagues are "similarly situated."  *Thiessen*, 267 F.3d at 1102–03; *accord*  29 U.S.C. § 216(b).  At this "notice" stage,

Plaintiffs must provide "substantial allegations . . . of a single decision, policy, or plan" affecting all putative class members. *Thiessen*, 267 F.3d at 1102 (internal citations and quotations omitted). Under this "lenient" standard, Plaintiffs' allegations must (1) describe the class and (2) provide facts suggesting that class members exist. *Landry*, 252 F. Supp. 3d at 1114 (internal citations and quotations omitted). The court examines "whether the potential class members: (i) have the same employer; (ii) are subject to the same employer practices; (iii) suffer the same method of calculation of wages owed; and (iv) allege FLSA violations based on the same conduct." *Pruess*, 2020 WL 6544243, at *3 (internal citation omitted).

### 2. Parties' FLSA Arguments

Both parties expressly rely on the reasoning and evidence proffered in their Rule 23 arguments. Plaintiffs' Motion reiterates their sources of evidence—*inter alia*, five declarations and the QLS handbook. Mot. at 16. And Plaintiffs already propose a class definition: "[a]ll current and former [DSPs] of [QLS] who worked over forty hours a week from August 3, 2019[,] to present and were not paid overtime wages for overtime hours worked." *Id.* at 1–2. By incorporating their Rule 23 arguments, Plaintiffs' contention that the proposed collective's members are "similarly situated" rests on their five declarants, the QLS handbook, and the alleged DSP pay policy. *E.g.*, *id.* at 8–9; *accord* ECF 27-1 at 9–10, 15–16, 20–21, 24–25, 30–32.

Defendants, on the other hand, emphasize that DSPs were not "similarly situated" because of material differences in their hourly rates, freedom in how to perform job duties, frequency of overtime shifts, and ability to engage in side work. Resp. at 8. Additionally, they debate certain details of the notice period that Plaintiffs seek, in the event the Court permits notice to be issued. *Id.* at 9; Mot. at 16–20.

### 3. Discussion

The Court incorporates its Rule 23 analysis in finding that Plaintiffs have adequately shown that they are "similarly situated" to the putative FLSA collective members. Plaintiffs define a collective comprised solely of QLS DSPs that worked any amount of overtime without ever receiving overtime premiums. Mot. at 1–2. By definition, this collective conditions membership on two characteristics: (1) working for "the same employer" and (2) being "subject to the same employer practices"—those practices being based on "the same method of [wage] calculation" that forms the basis of the "allege[d] FLSA violations." *Pogue v. Chisholm Energy Operating, LLC*, No. 2:20-cv-00580, 2021 WL 5861184, at *2 (D.N.M. Dec. 10, 2021) (citing *Landry*, 252 F. Supp. 3d at 1114–15). The collective definition mirrors the four quintessential FLSA guideposts listed above: same employer, same applicable employment practice, same harm from a universal wage calculation method, and a FLSA claim arising from that method. *E.g.*, *Pruess*, 2020 WL 6544243, at *3. Thus, the Court has little trouble concluding that Plaintiffs have defined a collective as required by *Thiessen*.

To prove the existence of this collective, Plaintiffs attached declarations from five individuals who once held the position and allege that there are indeed others like them. *See generally* ECF 27-1 at 9–26, 29–32. Mindful that resolving factual conflicts among the parties' declarations would tread dangerously close to "weigh[ing] evidence, resolv[ing] factual disputes, or rul[ing] on the merits," the Court takes these allegations at face value. *E.g.*, *Deakin*, 328 F.R.D. at 435–36 (finding seven sufficiently detailed declarations to be an adequate factual basis for conditional certification). The same foundation concerns persist when the Court considers extrapolating the declarants' experiences to the putative class members, but the notice standard

27

sets a lower burden of persuasion under the FLSA than Rule 23. The mere coincidence of multiple declarants alleging the same conclusions with at least a colorable foundation counsels the Court to find that the putative collective likely exists.

Whatever persuasive force that Defendants' two counterarguments generated under Rule 23 dissipates under the FLSA. Defendants' focus on the allegedly varied wage rates misses the point: the "pattern or practice of not paying overtime is [itself] sufficient to allege that [P]laintiffs were together the victims of a single decision, policy, or plan." *Pogue*, 2021 WL 5861184, at *2 (citing *Renfro v. Sparta Comp. Servs., Inc.*, 243 F.R.D. 431, 433–34 (D. Kan. June 20, 2007)). Defendants' emphasis on alleged variability in job duties is equally misplaced—it encourages a weighing of competing evidence to resolve factual disputes "instead of focusing on the alleged wrongful policy" and its scope. *Id.* at *3 (internal citation and quotation omitted); *e.g.*, *Landry*, 252 F. Supp. 3d at 1116 (citations omitted). Factual disputes like this are unripe for resolution until the decertification stage. *Calvillo v. Bull Rogers, Inc.*, 267 F. Supp. 3d 1307, 1312 (D.N.M. July 25, 2017) (positions must be "similar, not identical").

Mindful that the notice-stage standard is particularly lenient, the Court finds that Plaintiffs have met their burden by proffering substantial allegations that they and the putative class members were employees of the same company, all of whom worked in excess of 40 hours per week and were subjected to the same overtime policy. Plaintiffs have provided the requisite showing to justify notice and collective treatment under FLSA Section 216(b). The next issue involves the content and mechanics of that notice.

### 4.  Notice

Putative collective members become actual collective members only after submitting their consent in writing. 29 U.S.C. § 216(b). Accordingly, counsel representing FLSA collective

actions are permitted to send prospective class members notices because employees must receive "accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  The district court is encouraged if not required to supervise the content of FLSA collective notices.  *Id.* at 170.

Plaintiffs ask the Court to grant various requests related to their proposed class notice. Several of their requests are uncontested, namely that the Court: (1) require Defendants to produce in Excel format the names, addresses, telephone numbers, email addresses, and dates of employment for putative class members (the "Class List") within ten days of conditional certification; (2) allow Plaintiffs to send the Notice form themselves, via postal mail and electronic mail, within twenty days of conditional certification; (3) allow class members to execute consents electronically via Right Signature; and (4) require that Defendants post the Notice "on all jobsites for 60 days in an open and obvious location."  Mot. at 18; *cf.* Resp. at 9. Importantly, Plaintiffs provide a proposed Rule 23 notice and, in a footnote, ask that their proposed notice be treated as an FLSA notice if the Court chooses instead only to conditionally certify at this time.

Defendants, however, explicitly refrained from taking a position on the contents of Plaintiffs' proposed notice if conditional certification occurs because the proposed notice only pertains to certification under Rule 23, not the FLSA.  But Plaintiffs clearly stated their intent to style their FLSA notice in "substantially similar form to the Rule 23 class notice presented as Exhibit N."  Mot. at 18 n.4.  The Court construes Defendants' silence as tantamount to waiving any objection except insofar as the FLSA notice "substantially" deviates from Exhibit N.  Thus,

the Court approves these reasonable requests subject to two caveats: (1) Plaintiffs must provide an FLSA-specific draft notice that is in fact "substantially similar" to Exhibit N, and (2) Defendants may still lodge objections to the content of that proposed notice, but only insofar as it materially differs from Exhibit N.

Otherwise, the parties disagree on two issues: the length of the opt-in period and whether equitable tolling is appropriate. *Compare* Mot. at 18–19, *with* Resp. at 9.

### a.  Opt-In Period Length

Plaintiffs want a 60-day opt-in period whereas Defendants ask for a 30-day period.  For justification, Defendants assert that "the majority of reported decisions" set a 30-day opt-in period and cite five out-of-district cases, each old enough to predate the internet. *See* Resp. at 9. These cases represent a marked departure from the typical opt-in period length in this district. *See Landry*, 252 F. Supp. 3d at 1130 (75 days); *Corral v. Concho Res., Inc.*, 2022 WL 3715853, at *5 (D.N.M. Aug. 29, 2022) (60 days); *West v. Bam! Pizza Mgmt., Inc.*, No. 1:22-cv-00209, 2023 WL 346309, at *4 (D.N.M. Jan. 20, 2023) (60 days); *Saenz v. Rod's Prod. Servs., LLC*, 2:14-CV-00525, 2015 WL 12866985, at *2 (D.N.M. Mar. 6, 2015) (70 days).  The Court will authorize an opt-in period of 60 days from the date on which the Notices are mailed.

### b.  Equitable Tolling

Plaintiffs also ask the Court to provisionally toll the limitations period such that all putative class members may receive notice and the Court can address equitable tolling later on an ad hoc basis.  Defendants agree to provisional tolling but urge the Court to avoid deciding whether to equitably toll claims until the opt-in period concludes.  Noting the parties' agreement, the Court adopts Plaintiffs' request and will provisionally toll the statute of limitations such that

all putative members may at least receive notice.  The Court defers a final ruling on the equitable

tolling question until the actual opt-in claims are known with precision.

## V.       CONCLUSION

**IT IS ORDERED** that Plaintiff's Opposed Motion to Certify Class is **GRANTED in**

**part and DENIED WITHOUT PREJUDICE in part**, as follows:

(1) This case is conditionally certified as a collective action pursuant to 29 U.S.C. §

216(b) and will proceed as such unless good cause is shown to decertify the collective. The

collective shall be defined as:

> **All current or former Direct Support Personnel staff members of Quality**
> **Life Services LLC, April Licon, and Sally Chavez who worked over forty**
> **hours in any week from August 3, 2019, to present and were not paid**
> **overtime wages for overtime hours worked.**

(2) Within ten (10) days of this Order's entry, Defendants will provide Plaintiffs' counsel

in Excel (.xlsx) format the following information on all putative collective members:

a.  Full name;

b.  Last known address(es), including city, state, and zip code;

c.  Last known email address(es), including any non-company address(es);

d.  Last known telephone number(s);

e.  Beginning date(s) of employment/work; and

f.  Ending date(s) of employment/work (if applicable).

(3) Within twenty (20) days of this Order's entry, Plaintiffs' counsel will send a copy of

the Court-approved Notice Form to the putative collective members by First Class U.S. Mail and

via email.  Plaintiffs' counsel may also contact putative class members via telephone to follow-up and/or if the member's provided contact information proves invalid.

(4) Within twenty (20) days of this Order's entry, Defendants shall post the Court-approved Notice on all jobsites for sixty (60) days in an open and obvious location.  Defendants cannot remove the Notice for sixty (60) days from the date of this Order's entry.

(5) The collective members shall have sixty (60) days from the date on which the Notices are mailed to provide opt-in forms to Plaintiffs' counsel for filing with the Court.

(6) Plaintiffs are authorized to offer the putative collective members the opportunity to opt-in to this collective action through the use of Right Signature.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to certify their proposed class under Rule 23 is **DENIED WITHOUT PREJUDICE.**

**IT IS FINALLY ORDERED** that Plaintiffs shall have until **August 18, 2023**, by which to file a renewed motion seeking Rule 23 certification for their claims under the NMMWA.

**SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*