**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

JORGE GOLDEN, *individually and on*
*behalf of all others similarly situated*, and
ANTHONY YBARRA,

      Plaintiffs,

v.                                          Civ. No. 22-579 GJF/GBW

QUALITY LIFE SERVICES, LLC,
SALLY CHAVEZ, and APRIL LICON,

      Defendants.

**MEMORANDUM OPINION AND ORDER**
**GRANTING RENEWED MOTION FOR CLASS CERTIFICATION**

Plaintiffs move for a second time to certify a New Mexico Minimum Wage Act ("NMMWA") class action against their former employer, Quality Life Services, LLC ("QLS"), for improperly categorizing them and other direct support personnel ("DSPs") as independent contractors to avoid paying them overtime. ECF 95. In its previous Memorandum Opinion and Order denying class certification, the Court found that all Federal Rule of Civil Procedure 23 requirements had been met *except* for typicality. ECF 52, *passim*. The Court concluded that, at least at that relatively early stage, Plaintiffs had failed to demonstrate that their claims were sufficiently typical of the claims of the putative class because Plaintiffs had proffered insufficient evidence showing the putative class worked more than 40 hours a week as had the named Plaintiffs. *Id.* at 16-20. Although the Court denied the Rule 23 class certification motion without prejudice, the Court conditionally certified a collective action under the Fair Labor Standards Act ("FLSA") and ordered Defendants to disclose the names of all personnel who worked more than 40 hours a week during the relevant period. *Id.* at 31. After conducting additional discovery, Plaintiffs now renew the Rule 23 motion and provide a spreadsheet that lists 216 DSPs who

1

worked more than 40 hours a week for QLS.  Having reviewed the additional evidence, the Court finds the named Plaintiffs' claims typical of those of the putative class.  Incorporating by reference its earlier Memorandum Opinion and Order and having considered but rejected Defendants' new challenges to certification, the Court now **CERTIFIES** the following class under Rule 23 for the purpose of pursuing the NMMWA claim in Count 2 of the Amended Complaint:  All current and former Direct Support Personnel staff members of Quality Life Services, LLC, April Licon, and/or Sally Chavez who worked over forty hours during any week from August 3, 2019, to the present and who were not paid overtime wages for overtime hours worked.

## BACKGROUND

Defendant QLS is a New Mexico limited liability company formed by Defendants Sally Chavez and April Licon.  ECF 40 at ¶¶ 6–8 ("Am. Compl."); *see also* ECF 27-1 at 45.  QLS specializes in rendering "health care services to [developmentally disabled] patients in their homes or the health[-]care facilities" that house them.  Am. Compl. at ¶ 19; *see also* ECF 27-1 at 44; Quality Life Services LLC Home, https://qlsnm.com/ (last visited Apr. 26, 2023).  To provide these services, QLS hires DSPs.  ECF 27-1 at 28.  DSPs "[o]versee and assist" QLS's clients during "meal preparation, personal hygiene, [and] grooming"; chauffeur them; supervise them in "recreational activities both at home and in the community"; monitor them "during evening hours . . . in case of emergency"; informally advocate for their clients' "individual needs and desires"; "[a]ssist with chores, weekly budgets[,] and special requests"; and "[p]erform any other duties assigned by" QLS management.  *Id.* at 28.  Defendants promise these DSP-provided services "24 hours per day, 365 days a year."  ECF 51-1 at Bates No. 000171.[1]  Plaintiffs Jorge Golden and

---

[1] This exhibit was submitted to the Court without objection following the motion hearing held on April 7, 2023.

Anthony Ybarra (collectively "Plaintiffs") are former DSPs.  *Id.* at 15, 24.[2]

This case arises from how Defendants paid the DSPs.  Plaintiffs claim that Defendants made virtually all DSPs work overtime yet classified them as "independent contractors" instead of "employees" to avoid paying them federally mandated overtime wages.  *See* ECF 27 at 1; *accord* 29 U.S.C. § 207 (requiring employers pay employees at least one-and-a-half times their normal wage for any hours worked over 40/week).  On August 3, 2022, Plaintiffs filed this action seeking those unpaid overtime wages, which they allege were withheld in violation both of the Fair Labor Standards Act ("FLSA") and the New Mexico Minimum Wage Act ("NMMWA").  Am. Compl. at ¶¶ 61–62.

## RULE 23 CLASS CERTIFICATION STANDARD

Rule 23 governs class certification.  *E.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398–99 (2010).  The Rule allows certification of a class action if the trial court independently finds that Rules 23(a) and 23(b) are both satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).  Satisfying Rule 23 requires meeting Rule 23(a)'s four prerequisites and at least one of the three options allowed under Rule 23(b).  *E.g.*, *Soseeah v. Sentry Ins.*, 808 F.3d 800, 808 (10th Cir. 2015); *accord Dukes*, 564 U.S. at 351.

For its part, Rule 23(a) requires the party seeking certification to show that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

---

[2] At the April hearing, Plaintiffs' counsel explained that Plaintiff Ybarra's declaration is partly outdated because he stopped working as a DSP for QLS after filing his declaration.  *Compare* ECF 27-1 at 15, *with* ECF 40-1 at 1, *and* Tr. at 10:19–21.

*Dukes*, 564 U.S. at 345; *accord* Fed. R. Civ. P. 23(a).[3]  Second, the party seeking certification

"must also satisfy [with] evidentiary proof at least one of the provisions of Rule 23(b)." *Wallace*

*B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013)

(quoting *Dukes*, 564 U.S. at 350).  Here, the provision at issue is Rule 23(b)(3), which requires

showing that:

> [1] the questions of law or fact common to class members predominate over any
> questions affecting only individual members, and [2] that a class action is superior
> to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).[4]

These requirements "are heavily scrutinized and strictly enforced." *CGC Holding Co.,*

*LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014).  The party seeking certification

bears the burden of "affirmatively demonstrat[ing] . . . compliance with the Rule"—namely,

showing "that there are *in fact* sufficiently numerous parties, common questions of law or fact,

etc." *Dukes*, 564 U.S. at 350 (emphasis in original); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33

(2013) (requiring the same of Rule 23(b)).  The burden demands no less but no more than the

traditional measure of persuasion in civil cases—a preponderance of the evidence.  *E.g.*, *Abraham*

*v. WPX Prod. Prods., LLC*, 317 F.R.D. 169, 259 n.67 (D.N.M. Aug. 16, 2016).

Rule 23 is no "mere pleading standard," so the Court cannot "blindly rely" on the

representations of either party. *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004) (internal

citation and quotation omitted).  Rather, the Court must undertake a "rigorous analysis" to

---

[3] In class action vernacular, these requirements are known as "numerosity," "commonality," "typicality," and "adequacy." *See Dukes*, 564 U.S. at 350.

[4] Plaintiffs do not request certification under Rule 23(b)'s other provisions, so the Court does not discuss them. *See, e.g.*, *Dukes*, 564 U.S. at 346 n.2.

convince itself that Rule 23 is fully satisfied. *Dukes*, 564 U.S. at 350.[5]  The trial court can consider the claims' merits at the certification stage only insofar as those substantive issues overlap with Rule 23's procedural requirements.  *See, e.g.*, *id.* at 351 (district court's analysis will often "entail some overlap with the merits of the plaintiff's underlying claim"); *but see Amgen v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. . . . Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

The end result of the trial court's rigorous analysis is reviewed only for abuse of discretion. Reversal occurs only if the decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] . . . an improper application of law to fact[,]" or "hold[ing] a plaintiff seeking class certification to a higher standard of proof than proof by a preponderance of the evidence." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015); *accord DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

## PARTIES' ARGUMENTS

Plaintiffs seek to proceed on behalf of themselves and "[a]ll current and former [DSPs] of [QLS] who worked over forty hours a week from August 3, 2019[,] to present and were not paid overtime wages for overtime hours worked."  ECF 95 at 2.  In response to the Court's previous Order, Plaintiffs have provided additional evidence showing the 216 members of the putative class have worked more than 40 hours a week to support their assertion that the named Plaintiffs claims are typical of the putative class.  *Id.* at 16.  Because the Court previously found all other Rule 23

---

[5] The Court's analysis of a party's factual showing "will frequently entail overlap with the merits of the plaintiff's underlying claim."  *Behrend*, 569 U.S. at 33–34 (internal quotation omitted).  But the court's limited license to look towards the merits is coterminous with relevancy for Rule 23 purposes.  *Dukes*, 564 U.S. at 351; *Amgen Inc.*, 568 U.S. at 466.

requirements were met, Plaintiffs contend that this additional evidence should allow the Court to now certify the class. *Id*.

For their part, Defendants do not argue that Plaintiffs' new evidence fails to sufficiently demonstrate that members of the putative class worked more than 40 hours a week and were not paid an overtime premium, like the named Plaintiffs. See ECF 101 at 6. Instead, Defendants have submitted five new declarations that contradict evidentiary submissions by Plaintiffs to attempt to change the Court's prior finding regarding commonality. *Id*. at 5-6. The main thrust of Defendants' argument is that the independent contractor analysis will drive this litigation and is a highly factual and individualized inquiry likely to lead to varying outcomes depending on each DPS's control over their schedule, the clients they worked with, or the manner and means of taking care of those clients. *Id*.

Plaintiffs reply that Defendants are confusing the class certification and merits inquiries. ECF 111 at 7. Plaintiffs contend that the independent contractor analysis is a common question because centralized QLS policies govern all six factors in the independent contractor test under the NMMWA. Plaintiffs point out that the only factor of the independent contractor analysis that Defendants assert cannot be decided collectively is the issue of control, but Plaintiffs refute this assertion by citing QLS policies and practices governing every DSP's supervision, discipline, and scheduling. At bottom, Plaintiffs argue the modest differences to which Defendants are pointing is merits-stage evidence of DSPs being independent contractors, not fractures in the putative class. Thus, Plaintiffs insist that this question is really a merits dispute that does not prevent this question from being answered on a class-wide basis. *Id.* at 2-8.

## ANALYSIS

For the reasons explained below, Plaintiffs have now offered sufficient evidence

demonstrating the putative class worked more than 40 hours a week, like the named Plaintiffs. Additionally, none of the additional evidence Defendants have provided changes the Court's prior explicit findings that Plaintiffs have sufficiently demonstrated the remainder of the Rule 23 requirements for certification.

1. **Plaintiffs have sufficiently demonstrated the putative class worked over 40 hours a week, making the named Plaintiffs' claims typical of those of the putative class.**

In its prior Order, the Court found Plaintiffs had not submitted sufficient evidence showing the putative class worked overtime without receiving overtime pay and therefore failed to demonstrate the named Plaintiffs' claims were typical of the claims of the putative class. ECF 52 at 18. As stated above, Plaintiffs move for certification again, this time submitting a spreadsheet with the names of 216 putative class members who worked overtime during the alleged period. The Court finds this additional evidence satisfies its typicality concerns.

*a. Typicality Standard*

Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Although the claims need not be identical, the class representatives must generally "possess the same interest and suffer the same injury" as the unnamed class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982). As other courts have explained, typicality requires "enough congruence between the named representative[s'] claim[s] and that of the unnamed members . . . to justify allowing the named party to litigate" on the group's behalf. *Orr v. Shicker*, 953 F.3d 490, 500 (7th Cir. 2020) (internal quotation omitted); *see also Eagle v. Vee Pak, Inc.*, --- F.R.D. ---, 2023 WL 2198470, at *17 (N.D. Ill. Feb. 23, 2023) (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."

(internal citation and quotation omitted)).

In practice, this inquiry tends to merge with the commonality analysis because both focus on "whether the named plaintiff[s'] claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13. Typicality allows for some factual difference among the putative class members "so long as the claims of the class representative and putative class members are based on the same legal or remedial theory." *Bd. of Educ. of Albuquerque Pub. Schools v. Brainard*, 339 F.R.D. 650, 656 (D.N.M. June 7, 2021). But a plaintiff must prove that such extrapolation is justified by "demonstrat[ing] that [the named plaintiff's harm] persist[s] across the putative class." *Hernandez v. Grisham*, 494 F. Supp. 3d 1044, 1139 (D.N.M. Oct. 14, 2020).

### b. Parties' Typicality Arguments

Plaintiffs argue that their new spreadsheet effectively shows that 216 DSPs worked more than 40 hours a week and were denied overtime pay under QLS policies. ECF 95 at 16. Plaintiffs contend this new evidence sufficiently shows that the named Plaintiffs' claims of working more than 40 hours a week while being denied overtime pay as misclassified independent contractors is typical of the putative class. *Id*.

In response, Defendants do not contest that Plaintiffs' claim of working more than 40 hours a week and not receiving overtime is typical of the putative class. ECF 101 at 6. Instead, they argue typicality fails for the same reason commonality fails: the independent contractor analysis is different for various DSPs based on their control over their schedules, which clients they worked with, how they performed caregiver functions, and whether they worked for other caregiver agencies. *Id.* at 5-6. The Court addresses these commonality concerns later in this opinion. *Infra* Analysis § 2.

c.   *Typicality Findings*

By a preponderance of the evidence, the Court finds the Plaintiffs have "bridge[d] the gap" between the named Plaintiffs' claims and "the existence of a class of persons who have suffered the same injury." *Falcon*, 457 U.S. at 148.  To bridge that gap here, Plaintiffs would have to generally prove (1) that the same course of conduct gives rise to the claims of other class members and (2) that all class members base these claims on the same legal theory.  *See Vee Pak*, 2023 WL 2198470, at *17–18.  In this case, Plaintiffs must show that the putative class members are DSPs who (1) worked overtime, (2) did not receive overtime pay, and (3) that all members will trace this shared harm to the same class-wide policy.

Plaintiffs have now made a sufficient showing of typicality by submitting a spreadsheet showing that 216 DSPs worked over 40 hours a week without receiving overtime pay. Defendant Licon, in the corporate representative deposition, admitted that QLS classified *all* DSPs as independent contractors and *never* paid overtime premiums to any of the 216 DSPs who worked more than 40 hours per week in the relevant period. Ex. A, 34:10-23. *See also* Ex. B, ¶¶ 20-22 (declaration by Jennifer Padilla, lead service coordinator in charge of approximately 80 DSPs, confirming these facts and that these policies did not change based on a DSP's education, history, or background).

This evidence satisfies the Court's prior typicality concerns by demonstrating the putative class worked over 40 hours a week and was denied overtime pay like the named Plaintiffs, making the named Plaintiffs' claims typical of those of the putative class.

**2.  None of the Defendants' additional evidence or arguments undercuts the Court's prior Rule 23 determinations.**

The Court's prior Order concluded that Plaintiffs had satisfied all other Rule 23 requirements by showing the following: common questions existed regarding whether DSPs were

improperly classified as independent contractors and denied overtime pay while working more than 40 hours a week; those questions would predominate over individualized inquiries; the class of DSPs was numerous; and the named Plaintiffs were adequate representatives. ECF 52. Defendants again attack whether common questions will drive this litigation and predominate over other questions. Defendants argue the independent contractor analysis will need to be decided on an individual basis, thereby destroying commonality and predominating over class issues. ECF 101 at 5-6. Defendants support this argument with five new declarations that contradict some of Plaintiffs' prior evidentiary submissions and allegations to show DSPs had different experiences regarding control over their scheduling, the clients they worked with, and daily caregiver activities. Defendants also now for the first time attack the named Plaintiffs' ability to adequately represent the class. For the reasons explained below, Defendants' new evidence and arguments do not change the Court's prior findings regarding commonality, predominance, and adequacy.

    1. <u>Commonality</u>

       *a. Legal Standard*

Commonality demands proof of some "question[ ] of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Such a question—or, precisely, its answer[6]—must demonstrate the litigation's "capacity . . . to generate common *answers* apt to drive the resolution of the litigation." *E.g.*, *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 789 (10th Cir. 2019) (emphasis in original) (citing *Dukes*, 564 U.S. at 350). These common issues must be "capable of class[-

---

[6] To be clear, the text of Rule 23(a)(2) calls for common legal or factual *questions*—either "disputed [factual] issue[s] to be resolved . . . [at] trial" or "[disputed legal] issue[s] to be decided by the judge"—not *answers*. *Dukes*, 564 U.S. at 369 (Ginsburg, J., dissenting) ("[A] 'question' 'common to the class' must be a dispute, either of fact or of law, the resolution of which will advance the determination of the class members' claims."). But, as a five-justice majority explained, a common "question" does not necessarily produce an answer that justifies the continued use of a collective action. *Id.* at 349–52; *but see id.* at 374–77 (criticizing the majority's construction for importing Rule 23(b)(3)'s predominance requirement into the other two 23(b) classes). So, since *Dukes*, the inquiry now focuses on whether the class members "have suffered the same injury" rather than whether an open question of such class-wide harm may have occurred. *Id.* at 351 (internal citation and quotation omitted).

]wide resolution" and "central to the validity of each . . . claim[ ]." *Id.*  Thus, a successful plaintiff

must "identify some unifying thread among the members' claims that warrants class treatment"—

not issues "identical as to each member." *Felps v. Mewbourne Oil Co., Inc.*, 336 F.R.D. 664, 670

(D.N.M. Nov. 16, 2020).

"Still, commonality does not require that every member of the class share a fact situation

*identical* to that of the named plaintiff." *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1192

(10th Cir. 2023). "A finding of commonality requires only a single question of law or fact common

to the entire class." *Id.*

In cases involving employment policies, the unifying thread can be found by examining

"whether the challenged policy is common to the class as a whole, and whether the proposed class

members share similar job duties." *Felps,* 336 F.R.D. at 670.  Misclassification cases involving a

policy categorically applied to the entire class typically present a common question because "the

central question of whether employees were wrongfully classified as exempt from overtime pay

requirements" unites them.  *Id.* at 671 (internal quotation and citation omitted); *e.g.*, *Mullen v.

Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999).  Thus, provided that a plaintiff

can prove by a preponderance that the policy exists, Rule 23(a)(2) is satisfied.  *E.g.*, *Flores v.

Anjost Corp.*, 284 F.R.D. 112, 125 (S.D.N.Y. 2012); *see also Damassia v. Duane Reade, Inc.*, 250

F.R.D. 152, 159 (S.D.N.Y. May 27, 2008); *cf. Gandy v. RWLS, LLC*, CV No. 17-558, 2019 WL

1407214 (D.N.M. Mar. 28, 2019) (unreported) (finding the lack thereof dispositive and denying

certification because, unlike here, individualized inquiry was needed to assess the applicability of

an NMMWA exception).

### b.  *Parties' Commonality Arguments*

As in their previous motion for certification, Defendants argue DSP jobs are too variable

to collectively determine whether all the DSPs are independent contractors. Defendants have now submitted five new, paragraph-long declarations to support this argument. ECF 125.[7] Because these declarations are contrary to some of Plaintiffs' evidentiary submissions and allegations, Defendants argue DSPs have different experiences regarding their rate of pay, ability to influence their schedule, ability to work with specific clients, independence in performing caregiver functions, in addition to whether they worked for other caregiver agencies. ECF 101 at 5-6.

In reply, Plaintiffs argue that Defendants are confusing the class certification and merits inquiries. ECF 111 at 7. Plaintiffs contend that the independent contractor analysis is a common question because QLS maintained centralized DSP policies that govern all six factors in the independent contractor test: DSPs' opportunity for profit and loss, DSPs' investment in the business, permanence of the relationship, degree of skill required, extent to which the work is integral to the employer, and QLS's control over DSPs. Plaintiffs emphasize that the only factor of the independent contractor test that Defendants claim requires an individualized inquiry is the issue of control.  To that point, Plaintiffs assert that uniform policies still govern control over DSPs by providing uniform standards on DSP supervision and discipline; guidance, enforcement, and monitoring of duties; and scheduling. At bottom, Plaintiffs argue the modest differences Defendants are pointing to is evidence of DSPs being independent contractors, not fractures in the putative class. Thus, Plaintiffs insist that this issue is really a merits dispute and it does not effectively undermine the fact that this level of control is determined by centralized policies applicable to the entire class, leading to common questions of law and fact.

---

[7] These letters were originally filed without their signatories swearing to their truth under penalty of perjury. ECF 101-102. Plaintiffs objected to the letters and moved to strike them. ECF 112. In conjunction with responding to the motion to strike, Defendants refiled these letters as declarations with appropriate attestations.  ECF 125. Plaintiffs filed neither a reply brief nor any separate objection to these declarations. Thus, the Court finds Plaintiffs have not objected to the five sworn declarations contained in ECF 125, will consider them for all appropriate purposes, and will deny the motion to strike.

### c. Commonality Findings

The Court has already found that Plaintiffs have established a class-wide employment policy to not pay any DSP overtime when they worked more than 40 hours a week. ECF 52 at 13-15. Defendants do not refute this finding. *See* ECF 101 at 5-6. Moreover, the Court notes that other courts have certified classes based on this type of common policy. *E.g., Felps*, 336 F.R.D. at 672 (resting commonality "on the contention that the policy and practice of [mis]classif[ication] – [*sic*] together with the standard practice of assigning [overtime] – [*sic*] 'had the effect of causing the class to perform uncompensated work.'"). Like employers in other cases where commonality was proven, Defendants here also "do[] not consider any factors other than job title in deciding to categorize [DSPs] as exempt." *Damassia*, 250 F.R.D. at 159.

Plaintiffs have shown that the independent contractor test can be applied and resolved class-wide based on centralized policies. The Court previously found that centralized policies standardized DSP job duties and controlled for all variables that would otherwise pose the potential for individualized inquiries capable of undermining commonality. ECF 52 at 14. Plaintiffs have now provided even more detail about how the independent contractor six factor test will be applied based on these centralized policies. ECF 111 at 3-8 (arguing that every DSP is paid hourly without the opportunity for profit or loss, must invest in an operable vehicle for their shifts, and works in a non-permanent, at will capacity; that the same baseline degree of skill is required for all DSP positions; that all DSPs play the same integral role in the employer's business; and that centralized policies determine the level of control that QLS exerts over each DSP's performance).

Defendants' new evidence does not invalidate the Court's prior determination that the independent contractor analysis can be conducted on a class-wide basis. Defendants again argue that differences in DSP pay and whether DSPs worked for other caregiver agencies will affect the

independent contractor analysis. But as the Court stated in its previous Order, a range of hourly wages does not change the fact that each DSP was denied overtime pay for overtime worked, and plugging in different values for a variable in the damages equation does not change the structure of the equation.  Further, the Court endorses its earlier view that whether DSPs moonlighted at other caregiving agencies is not especially relevant.  After all, modern society is increasingly replete with employees of one employer having second jobs with another.

Defendants' arguments regarding control over scheduling do not effectively refute Plaintiffs' assertion that the independent contractor analysis is a common question of law or fact for the class. Defendants hinge their position on five newly filed declarations from DSPs stating that they had control over their schedules. ECF 101 at 5 and ECF 125. These declarations seemingly contradict Plaintiffs' evidentiary submissions that other DSPs were not easily able to influence their own schedules. To be sure, this new evidence does show that some DSPs believed they had satisfactory control over their schedules while other DSPs didn't. But Defendants have failed to overcome Plaintiffs' evidence from QLS manager depositions and QLS policies that QLS creates the available shifts and advertises them for appropriately trained DSPs to sign up for. This evidence demonstrates that QLS had a centralized scheduling system that applied to every DSP. Certainly, under any scheduling system, some workers may be able to achieve the flexibility they desire while others cannot. But what drives the commonality inquiry is whether there is a centralized scheduling system governed by policies and practices that apply to the whole class. Plaintiffs do not have to prove that every class member was equally able to achieve his or her desired level of flexibility under that centralized system. Therefore, Defendants' evidence may be relevant to whether QLS's centralized system provided enough flexibility such that DSPs should be deemed independent contractors. But Defendants' evidence does not undercut commonality

because scheduling was determined by a centralized system that was applied class-wide.

Defendants' argument regarding differences in control over which clients a DSP can work with fares no better. Once again, QLS uses centralized policies and practices to control each DSP's schedule and training, a circumstance that affects the kinds of clients with whom a DSP can work. QLS creates and advertises the shifts available for each client through centralized software it controls, and which every DSP uses. QLS is also responsible for training DSPs on the clients with whom they work. Through these centralized policies and practices, DSPs are matched with each client for every shift. So again, while Defendants' contrary evidence shows that within this centralized system some DSPs were able to work with the clients they wanted while other DSPs felt QLS dictated the clients they worked with by controlling which clients they were trained on, everyone agrees the centralized system controlled every DSP's schedule and required them to be trained on the specific clients with whom they were going to work. Thus, there is a common question of whether this system provided enough flexibility to weigh in favor of the DSPs being deemed independent contractors.

Defendants' assertions of a lack of micromanaging do even less to undercut the commonality of the independent contractor analysis because Plaintiffs have never argued that they were micromanaged. Plaintiffs instead argue that the level of control over DSP day-to-day activities is determined by centralized policies governing DSP daily activities, supervision, enforcement, and discipline. ECF 111 at 6-7; ECF 95-2 (QLS's 98-page policy handbook detailing policies governing DSP nurse supervision of medical issues, steps for hospice care, client integration into the community, requirement of detailed support instructions for each client, and operation of vehicles). Accordingly, testimony from certain DSPs that these policies did not amount to micromanaging may be relevant to the merits of the independent contractor analysis,

but it does very little to show that DSPs were not all governed by centralized policies leading to common legal and factual questions worthy of class certification and resolution.

In sum, Defendants' additional evidence does not change the Court's prior finding regarding commonality. The combination of Plaintiffs' declarations, the QLS handbook, and Defendants' acknowledgment of a uniform pay policy convinces the Court that the independent contractor analysis is a "question[ ] of law . . . common to the class" that, once answered, would "resolve an issue that is central to the validity of each [claim] in one stroke." *Dukes*, 564 U.S. at 350.  Further, Plaintiffs' evidence strongly suggests that no serious risk of individualized inquiries exists regarding supposed differences in job duties. The commonality requirement is satisfied.[8] Defendants' new evidence only demonstrates that not "every member of the class share[s] a fact situation *identical* to that of the named plaintiff[s,]" which has never been a requirement for Rule 23 certification. *Sherman*, 84 F.4th at 1192.

2.  <u>Predominance</u>

a.  *Legal Standard*

To proceed collectively under Rule 23(b)(3), a plaintiff must show "that the questions of law or fact common to class members [1] predominate over any [individual questions], and [2] that a class action is superior to other available m[eans of] adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

The purpose of Rule 23(b)(3) is to "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness."  Fed. R. Civ. P. 23, Advisory Committee Notes to the 1966 Amendments.  To animate

---

[8] Because the independent contractor analysis is a common question, it supports the named Plaintiffs' claims being typical of the putative class because this question can be answered for all—named and unnamed—class members in one stroke. Thus, Defendants' typicality arguments, ECF 101 at 6, based entirely on their commonality arguments, are unpersuasive.

this purpose, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Performing this test requires understanding the relationship between the common and individual questions presented in the case. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  An "individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.*

The predominance inquiry begins "with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).  After establishing all elements of a claim and segregating the individual and common issues, the court then "asks whether the common, aggregation-enabling[ ] issues in the case are more [salient] than the non-common, aggregation-defeating, individual issues." *Bouaphakeo*, 577 U.S. at 453 (internal citations and quotations omitted).  Answering this question requires examining how much individualized proof or legal argument a plaintiff would need to establish the majority of those elements. *E.g.*, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004), *partly abrogated on other grounds*, *Dickens v. GC Servs., Ltd. P'ship*, 706 F. App'x 529 (11th Cir. 2017).  Where individualized damages determinations are concerned, the case law is settled—the need to calculate each class member's damages does not defeat predominance. *E.g.*, *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922–23 (10th Cir. 2018).

Here, the predominance inquiry depends on the elements of the NMMWA claim, both of which use the "economic reality" test. *E.g.*, *Casias v. Distrib. Mgmt. Corp., Inc.*, Civ. No. 11-00874, 2014 WL 12710236, at *10 (D.N.M. Mar. 31, 2014) (unreported); *accord Garcia v. Am.*

*Furniture Co.*, 689 P.2d 934, 938 (N.M. 1984) (listing factors including "pay, contract, control[,] and voluntary action" that comprise the "total employment situation which disclose[s] the economic reality"). "The focal point" under this test is "whether the individual is *economically dependent* on the business to which he renders service, or is, as a matter of economic fact, in business for himself." *Casias*, 2014 WL 12710236, at *10 (citing *Doty v. Elias*, 733 F.2d 720, 722–23 (10th Cir. 1984)). Factors relevant to these elements include (1) the degree of control the employer exerts over its worker, (2) the worker's opportunity for profit or loss, (3) the worker's investment in the business, (4) the permanence of the working relationship, (5) the degree of skill required, and (6) the extent to which the work is an integral part of the employer's business.

### b. Predominance Analysis

Defendants' predominance argument rests entirely on their previous commonality arguments that the Court found unpersuasive. ECF 101 at 7. Because the Court finds that the independent contractor analysis is a common question, that question weighs in favor of predominance rather than against it. Additionally, any of the minor differences among the putative class that Defendants have identified, like differences in hourly wage, will not cause individual inquiries to predominate because, as the Court explained above, this difference will only change the hourly rate variable in the damages equation and not the structure of the equation that can be applied class-wide.

As already discussed, the QLS handbook provides policies that dictate how DSPs are expected to perform their jobs. *See generally* Ex. 51-1. Each of the DSP declarants' allegations are consistent with the handbook's policies, which further corroborates their allegations about how a DSP is expected to work. *Compare, e.g.*, *id.* at Bates No. 000212 (forbidding specific circumstances like leaving car keys in the vehicle unattended or allowing doors to be unlocked

while driving), *with* ECF 27-1 at 9–10, 15, 20, 24, 30 (alleging similarly high levels of control in DSP mandatory reporting duties, check-ins, and scheduling discretion). Based on these factual showings, the question of job similarity is a common question because it is "susceptible to generalized, class-wide proof." *Bouaphakeo*, 577 U.S. at 453; *but cf.* Resp. at 2 (responding to this evidence with a lone and conclusory allegation). Further, not only did all DSPs perform substantially similar work for QLS, all DSPs were apparently "paid under the same policy." *Bouaphakeo*, 577 U.S. at 459. The policy's applicability is susceptible to class-wide, generalized proof.

The two salient NMMWA issues here, job similarity and pay policy, both lend themselves to class-wide, generalized proof. The Court finds that Plaintiffs have made a sufficient showing of predominance.

### c. *Superiority*

Rule 23(b) provides four factors for courts to consider in determining whether collective treatment is the superior means of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Rule 23(b)(3)(A)–(D).

### d. *Parties' Superiority Arguments*

Plaintiffs' superiority arguments address all four Rule 23(b)(3) factors. They contend that the class members' interest in controlling their claims is minimal because these are low-wage workers that have never attempted to sue before and likely would not but for the class action mechanism. ECF 95 at 19-20; ECF 27 at 12; *accord* ECF 27-1 at 49–50 (showing no lawsuits

naming Defendant QLS on PACER); ECF 111 at 12-13.  They further assert that, because QLS operates solely in Doña Ana County, concentrating the litigation in this forum is particularly desirable. ECF 95 at 19-20; ECF 27 at 12.  Last, they submit that the class will not be particularly unmanageable because the members are easily identifiable, relatively small, and limited to a "discrete geographical location."  *Id.* (internal citations and quotations omitted). Defendants' response addresses only one factor, the class members' motivation to sue separately.  Their rationale: "these facts alone do not show that potential class members would not be motivated to initiate their own lawsuit" because the alleged damages in this case are not similar to the small individual amounts in other class actions like 25 and 100 dollars. ECF 101 at 8.

### e.  Superiority findings

As the Court found in its previous Order, the putative class members are low-wage employees, none of whom have ever attempted to sue before.  ECF 52 at 23.  The likelihood that the members could be motivated to individually control their claims is thus demonstrably low at best, and no evidence before the Court suggests that any DSPs have a lawyer they trust (besides, of course, the named Plaintiffs).  The evidence further shows that all putative members at least recently resided and worked in the vicinity, and no facts before the Court suggest class member idiosyncrasies troublesome enough to cast doubt on the manageability of this case as a class action. Thus, the Court again finds the Rule 23(b)(3) factors favor collective treatment. *Id.*

### 3.  Adequacy of Representation

#### a.  Legal standard

Adequacy of representation requires that the named plaintiff(s) show the "representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4).  Courts construe this prerequisite to demand adequacy of both named plaintiffs and their attorneys.  *E.g.*,

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 379 n.5 (1996) (characterizing the requirement as a due process requirement).   To be considered "adequate," named plaintiffs must be free of conflicts of interest and demonstrate the capacity to "prosecute the action vigorously" on behalf of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002).  "Adequate" counsel must be qualified and competent.  *Falcon*, 457 U.S. at 157.

When analyzing the adequacy of class representatives, it is important to keep in mind that "few plaintiffs come to court with halos above their heads; fewer still escape with those halos untarnished. For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility . . . , creating a potential adverse impact on the class." Newberg and Rubenstein on Class Actions § 3:68 (6th ed.) (citing *Dubin v. Miller*, 132 F.R.D. 269, 272 (D. Colo. 1990)); *see also Soseeah v. Sentry Insurance*, 2014 WL 11430942, at *5 (D.N.M. 2014); *Lane v. Page*, 272 F.R.D. 558, 579 (D.N.M. 2011) (quoting Newberg on Class Actions and holding a representative's criminal record was insufficient reason to consider them inadequate**)**.

### b.  Party arguments

Defendants challenge the adequacy of the named Plaintiffs, arguing that their criminal histories make it difficult for them to be fiduciaries of the class and vigorously prosecute the case. ECF 101 at 7. Defendants point to Mr. Ybarra missing two depositions as evidence of the named Plaintiffs' criminal histories getting in the way of representing the class. *Id.*

Plaintiffs respond that Mr. Golden's previous conviction was for providing alcohol to a minor in 2005, which is too old and attenuated from this case to make him an inadequate class representative. ECF 111 at 10-12. Additionally, Plaintiffs state that Mr. Golden's recent arrest has so far not led to any charges. *Id.* Regarding Mr. Ybarra, Plaintiffs state that he has resolved the

drug addiction and petty crime proceedings that caused him to miss his first two depositions and that these problems will not prevent him from effectively litigating this case going forward. *Id.* Plaintiffs also offered declarations and deposition excerpts showing that the named plaintiffs understand their role in the litigation, are ready to pursue the case, and have already spent over 35 hours working on the case. *Id.*

                    *c.   Findings*

The Court finds that the named Plaintiffs are sufficient class representatives. While the Court is concerned about Mr. Ybarra's recent drug use and criminal history twice interfering with his deposition, Defendants have not shown that his history is of a nature that will irrevocably jeopardize his credibility to the factfinder or otherwise prejudice the class. Additionally, Plaintiffs have offered evidence that both named representatives understand their duties and are ready and willing to vigorously prosecute this case. Because Defendants only attack adequacy based on the representatives' criminal histories and the Court does not find this history will prejudice the class, the Court finds the adequacy requirement under Rule 23(a)(4) to be satisfied

**CONCLUSION**

For the foregoing reasons, **IT IS ORDERED** that Plaintiffs' Renewed Opposed Motion for Class Certification [ECF 95] is **GRANTED**.

**IT IS FURTHER ORDERED** that the following class is **CERTIFIED** with respect to the NMMWA claim in Count Two of the Amended Complaint: All current and former Direct Support Personnel staff members of Quality Life Services, LLC, April Licon, and/or Sally Chavez who worked over forty hours during any week from August 3, 2019, to the present and who were not paid overtime wages for overtime hours worked.

**IT IS FURTHER ORDERED** that, **no later than fourteen (14) days after the filing of**

**this Memorandum Opinion and Order**, the parties shall confer and file a revised proposed "Notice of Class Action Lawsuit for Unpaid Wages" similar to the exemplar submitted as Exhibit N to Plaintiffs' original Motion to Certify [ECF 27]. The Court notes that the exemplar mentioned only Plaintiff Golden as a class representative, did not include an opt-in deadline (which should be fixed at 60 days after the notice is mailed), and did not include the contact information for the class administrator.

 **IT IS FURTHER ORDERED** that Plaintiffs' Opposed Motion to Strike Defendants' Evidence in Support of Their Response to Plaintiffs' Renewed Motion for Class Certification [ECF 112] is **DENIED**.

 **IT IS FINALLY ORDERED** that, **no later than December 15, 2023**, the parties shall confer and propose to Judge Wormuth a revised pretrial schedule, including proposed discovery and motions deadlines, that takes into account the Rule 23 class this Court now has certified. If and when Judge Wormuth implements a revised pretrial schedule, this Court will conduct a status conference to solicit the parties' views on a revised date for the bench trial.

 **SO ORDERED.**

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
*Presiding by Consent*